460 A.2d 305

**Jack A. BEAVER**

v.

**Hilma BEAVER, Appellant.**

Superior Court of Pennsylvania.

Submitted Feb. 10, 1983.

Filed April 29, 1983.

514

William S. Kreisher, Bloomsburg, for appellant.

John M. Kuchka, Bloomsburg, for appellee.

Before BROSKY, CIRILLO and LIPEZ, JJ.

BROSKY, Judge:

This appeal follows the granting of a divorce to appellee, husband. The action was brought pursuant to the 1929 Divorce Law [1] and was based on appellee's allegations that his wife subjected him to indignities that rendered his condition intolerable and life burdensome. On appeal, Mrs. Beaver contends that her husband sustained neither his burden of proving that she had subjected him to indignities, nor his burden of showing that he was the injured and innocent spouse. For the reasons that follow, we reverse.

Initially, we must examine what is our scope of review. In *Schrock v. Schrock*, 241 Pa.Super. 53, 57–58, 359 A.2d 435, 437–438 (1976), we explained:

> [I]t is our duty, on appeal, to make an independent study of the record and to determine whether a legal cause of action for divorce exists. *Barr v. Barr*, 232 Pa.Super. 9, 331 A.2d 774 (1974); *Arcure v. Arcure*, 219 Pa.Super. 415, 281 A.2d 694 (1971). Moreover, while the master's findings of fact and recommendation that a divorce be granted are only advisory, where the issue is one of credibility and the master is the one who heard and observed the witness, his findings should be given the fullest consideration. *Gehris v. Gehris*, 233 Pa.Super. 144, 334 A.2d 753 (1975); *Sells v. Sells*, 228 Pa.Super. 331, 323 A.2d 20 (1974). Thus, in a case such as this, '[i]f the ultimate decision rests on a statement asserted by one party and denied by the other, where there is no corrobo-

---

1. Act of May 2, 1929, P.L. 1237, § 10, *as amended;* (Repealed by the Act of April 2, 1980, P.L. 63, No. 26 §§ 101 et seq.; 23 Pa.S.A. § 101 et seq.)

rative evidence, demeanor on the stand is necessarily dispositive of the issue and is the kind of evidence that cannot effectively be reviewed by an appellate court. (citations omitted).' *Gehris v. Gehris, supra,* 233 Pa.Super. at 148, 334 A.2d at 755.

Furthermore, as to the burden of proof placed on appellant, we note the following principles.

Appellate courts have not formulated a single definition of indignities. We explained in *Barton v. Barton,* 248 Pa.Super. 278, 283, 375 A.2d 96, 98 (1977):

> [I]ndignities may consist of vulgarities, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, or malignant ridicule. *Gehris v. Gehris,* supra, 233 Pa.Super. at 147–48, 334 A.2d at 754–755. See also, *McKrell v. McKrell,* 352 Pa. 173, 42 A.2d 609 (1945); *Sells v. Sells,* 228 Pa.Super. 331, 323 A.2d 20 (1974); *Fodor v. Fodor,* 221 Pa.Super. 321, 292 A.2d 485 (1972); *Gerenback v. Gerenback,* 199 Pa.Super. 410, 186 A.2d 49 (1962). Obviously, several of the factors listed above may coalesce to justify a finding of indignities, although taken separately, no single incident or factor would be sufficient. See *Gehris v. Gehris,* supra.

In addition to proving indignities, the moving party must also prove that he or she is the injured and innocent spouse. *Rorabaugh v. Rorabaugh,* 302 Pa.Super. 1, 448 A.2d 64 (1982). To be innocent and injured, a spouse need not be blameless. *Gray v. Gray,* 220 Pa.Super. 143, 286 A.2d 684 (1971). The spouse who asserts that he or she is innocent and injured, however, must not provoke the alleged indignities, unless the other spouse's retaliation is excessive. *Rensch v. Rensch,* 252 Pa.Super. 294, 381 A.2d 925 (1977). It has been said that a finding that the moving party is the innocent and injured spouse is a prerequisite for entitlement to a divorce on the grounds of indignities. *Rorabaugh v. Rorabaugh, supra.*

With these principles in mind, we turn to the facts of the instant appeal.

The parties were married in June, 1943. This divorce action was commenced by appellant in October, 1979. Mr. Beaver contends that his wife began to commit indignities in 1976, although almost all of his allegations stem from activity commencing in January, 1979.

Mr. Beaver did, however, cite one incident in 1976 that caused him distress. At that time, the parties' son, who was in his late twenties, visited the parties' home with his wife, child and mother-in-law. During the visit, appellant says his wife treated the guests very badly; and, as a result, their son said he would not return to their home.

Similarly, during a visit in early 1979, Mr. Beaver says his wife treated their daughter poorly. He cited as an example an occasion on which Mrs. Beaver told the daughter not to close the hasp on her watch against a table. Mr. Beaver said his wife had "balled out" the daughter. After their daughter left, Mr. and Mrs. Beaver had a disagreement as to Mr. Beaver's purchase of a coat for their daughter during the visit. Mr. Beaver testified that his wife referred to their daughter as a "slut" and that hurt him so much that he threw hamburger at his wife, striking her.

As to the allegations that Mrs. Beaver's behavior toward the two oldest children caused appellant distress, we note that it is true that if a spouse mistreats the child of the moving spouse, such mistreatment can constitute an indignity. *McCaskey v. McCaskey*, 253 Pa.Super. 360, 385 A.2d 378 (1978). However, in order to find that the abusive parent is not the innocent and injured spouse, the facts of each case must be considered, including the severity and regularity of abuse. *McCaskey, supra*. We have similarly considered the severity and frequency of the alleged abuse in this case and find the record insufficient to term Mrs. Beaver's actions toward her oldest children an indignity to her husband.

The master did find that Mrs. Beaver verbally abused her husband calling him a "whore master" and that she falsely accused him of engaging in illicit affairs. These accusa-

tions were made to third parties and the record indicates no justification for them.

Although he sustained an objection to such evidence at hearing, the master also found as a fact that Mrs. Beaver had purposely used appliances in the house while her husband was taking showers, so as to deprive him of hot water.

The master also concluded that Mrs. Beaver had taken the telephone in her room off the hook, so as to make it impossible for Mr. Beaver to make or receive calls.

The master found that the parties had stopped sharing a bedroom in 1976 when appellant moved to another room. He found credible Mr. Beaver's testimony that his wife did not clean his room or do his laundry.

The master also believed appellant's testimony that his wife accused him, during a conversation with a third party, of buying an insurance policy on his youngest son because he planned to kill the boy.

■ We need not recite the many other factual findings made by the master. As to questions of credibility, we, of course, defer to his judgment. See *Schrock*, supra. We can assume that Mrs. Beaver engaged in the activity cited above. However, we disagree as to other findings by the master.

In his report, the master says that most importantly, he found credible Mr. Beaver's testimony that Mrs. Beaver had turned the parties' youngest son against him.

Mr. and Mrs. Beaver have an adopted son, Scott, who was ten years old at the time of the hearing. The boy sleeps in the same room with his mother and is apparently fearful of and distant from his father.

We have no difficulty accepting the truth of the testimony that his son is fearful of Mr. Beaver. In fact, Mrs. Beaver may encourage the antagonism that Scott feels towards appellee. However, Mr. Beaver has not introduced evidence to substantiate his claim that Mrs. Beaver is responsible for the strained relationship.

When Mr. Beaver was asked to what he attributed the strain in his relationship with his son, he responded that he believed it was caused by his son spending most of his time with his mother. He said, "They are together continually day and night while I am out providing a livelihood. I lay the blame on the fact that he did witness my throwing this piece of hamburger at her, and he has witnessed a couple of arguments and he has taken a side with her through her influence against me."

■ Mr. Beaver did not however, indicate any specific efforts by his wife designed to cause a strain in his relationship with Scott. Taken as credible, his testimony shows only that he believed his wife to be the cause of the problem. It provided no evidence of such. Furthermore, we have considered in this light Mr. Beaver's testimony that after January, 1979, he remained distant from his family. Because he had not been asked by Mrs. Beaver to join her and Scott for dinner, Mr. Beaver did not eat with them, but took his meals out of the house. He said that he spent his time at home alone in a basement recreation room, but he also clearly indicated that he voluntarily isolated himself.

When Mrs. Beaver refused to discuss their problems on one occasion in February or March, 1979, Mr. Beaver gave up any attempt to speak with her. Instead, they communicated via notes. Mr. Beaver underlined the word "parasite" in the dictionary leaving it for his wife to see. The master found that he called his wife a parasite and told her he hated her.

In June and in August, 1979, Mr. Beaver made trips without his family. In June, he was gone three or four days and left a note for his wife informing her that he would be gone. In August, Mr. Beaver made a three-week trip to the West Coast, informing Mrs. Beaver by way of a letter mailed immediately prior to his departure. In August, he enclosed $150 with the letter. Mrs. Beaver was not told the addresses where Mr. Beaver would be staying, nor was she told in advance of his plans. Upon his return from the June trip, Mrs. Beaver did throw Mr. Beaver's

clothes out of the dresser and called him a "whore master." While we certainly do not encourage such behavior, we do believe that Mr. Beaver's unannounced trip may have provoked Mrs. Beaver's response.

Similarly, when Mr. Beaver was asked to what he attributed his wife's unsubstantiated allegations of adultery, he responded, "Probably because I don't spend much time at home. I try to avoid being at home."

Mr. Beaver was asked if he had ever provoked his wife in any way by leaving her notes or messages. He responded, "I wouldn't be surprised that I have, yes."

The master also found that Mr. Beaver swung a footstool at his wife and threatened to kill her.

Although the master found much of appellant's conduct reprehensible, he nonetheless concluded that Mr. Beaver was provoked by his wife.

■ Even accepting the master's conclusion that the credible evidence as well as appellant's demeanor and conduct in court evidenced her hatred for and estrangement from appellee, we cannot agree with his conclusion that appellee was an injured and innocent spouse.

By his own admission, Mr. Beaver separated himself from his family and provoked his wife to anger.

Appellee complained that after the incident with his daughter in January, 1979, the marriage deteriorated. He laid blame for that deterioration on his wife's unwillingness to talk about their problems. Yet, by his own admission, appellant made but one attempt after January, 1979 to speak with his wife about their difficulties. He clearly said he made no other efforts and in fact absented himself from his family, not even taking meals with them when he was at home.

■ Although a party need not be entirely free from fault to be an innocent and injured spouse, *Rorabaugh v. Rorabaugh, supra,* it is apparent to us that here the husband's derelictions were not a minor or passing phenom-

enon, but went to the very heart of the cause which brought about the marital difficulties. See *Liebendorfer v. Liebendorfer*, 289 Pa.Super. 339, 433 A.2d 480 (1981).

Order reversed.