## Lizik v. Lizik

*Laurel Diznoff,* for plaintiff.
*Matthew Budash,* for defendant.

HANNA, *J.,* December 3, 2007—This matter comes before the court on defendant's exceptions and plaintiff's

counter exceptions to the report and recommendation of the divorce master. For the reasons set forth in this opinion, the court grants defendant's exceptions 1, 3 and 5, and denies exceptions 2, 4 and 6. Plaintiff's exceptions 4 and 7 are granted, and 2, 5, 6, 8, 9 and 10 are denied.[1]

## FACTUAL AND PROCEDURAL HISTORY[2]

Anne Catherine Lizik (Wife) and John Gerald Lizik Jr. (Husband) were married on August 28, 1976. Three children were born of the marriage, all of whom are now adults.[3] The parties separated on May 3, 2003. Wife filed for divorce on July 29, 2003. Husband filed a motion for appointment of master on August 11, 2006. In response, Wife filed a motion to quash appointment of master, which was denied by this court on October 25, 2006. Following a pre-hearing/settlement conference on December 7, 2006, a master's hearing was held on December 14, 2006 before Divorce Master Sharla Coughlin, Esquire. Based on the testimony presented, the master filed a report on March 5, 2006. She recommended: equitable distribution in a 55 percent-45 percent split in Wife's favor,[4] holding Wife responsible for outstanding and future Parent PLUS loans, and denial of alimony and counsel fees. (Master's report at 29, 38, 39.)

---

1. Exceptions 1 and 3 were withdrawn, as explained below.

2. These facts were derived from the master's report, the pleadings and the hearing transcript.

3. The children are: Jennifer Elizabeth Lizik (dob 6/18/81), Stephanie Ann Lizik (dob 7/5/83) and Joshua John Lizik (dob 7/28/85).

4. See pages 28-29 of master's report for the complete distribution scheme.

On April 25, 2007, Husband filed six exceptions to the master's recommendations.

(1) Master erred by including as marital debt pre-separation Parent PLUS loans incurred on behalf of parties' adult children.

(2) Master erred by including as a factor for equitable distribution post-separation Parent PLUS loans incurred by Wife (as expense of Wife).

(3) Master erred by determining the Husband retained household contents having value of $16,000.

(4) Master erred by considering as a factor for equitable distribution that Wife paid $800 per month in rent.

(5) Master erred by not giving Husband credit for post-separation payoff of the Pontiac Grand Am in the amount of $4,430.

(6) Master erred by awarding Wife 55 percent of the marital assets.

On May 14, 2007, Wife filed 10 counter exceptions.

(1) The master's recommendations are against the weight of the evidence.

(2) Master erred in determining value of marital residence to be $140,000 (by splitting difference between parties' appraisals)—master should have found it to be $145,000.

(3) Master erred in reducing value of marital residence by sales commission when there was no evidence that Husband intended to sell the property.

(4) Master erred in not granting Wife's request for fair rental value.

(5) Master erred in finding that Wife received parties' 2002 income tax refund.

(6) Master erred in finding that Husband did not dissipate value of Pontiac Grand Am.

(7) Master erred in failing to consider Husband's pre-separation, individual checking account as a marital asset.

(8) Master erred in finding that Husband had only $85,000 in separate property.

(9) Master erred in not awarding Wife 60 percent of the marital property.

(10) Master erred in not granting Wife alimony (failed to consider needs of parties and difference in income; failed to find Husband committed indignities; failed to allow testimony re: Husband's discipline of the parties' children as evidence of indignities.

Wife withdrew exception 1 and 3 at the argument before this court on September 26, 2007. This withdrawal was confirmed in a letter to the court dated November 27, 2007. For the purpose of consistency and clarity, the court will continue to refer to the remaining exceptions by their original numbers in this opinion.

## DISCUSSION AND ANALYSIS

Each party's exceptions will be discussed in turn below. As Husband filed his exceptions first, they will be addressed first.

*Husband's Exceptions*

(1) *Master erred by including as marital debt pre-separation Parent PLUS loans incurred on behalf of parties' adult children.*

The master gave Wife credit for the pre-separation Parent PLUS loans because they were "*apparently* something the parties *may* have agreed to DURING the marriage and was their 'joint' responsibility." (emphasis added) (Master's report at 8.) Husband argues that he never agreed to pay for the children's college education, and he should not be penalized for Wife's gratuitous decision. Wife contends that Husband was untruthful in his testimony.

It is first important to note that parents are under no obligation to pay for their children's college education. See *Blue v. Blue,* 532 Pa. 521, 616 A.2d 628 (1992). Therefore, the issue before the court is strictly whether or not the Parent PLUS loans are a marital debt. Debts that accrue jointly before separation are marital debts. However, a debt accrued during this time may be a non-marital debt where the other spouse did not take part in incurring the debt and received no benefit therefrom. Without documentation to support a spouse's allegations regarding marital debts, the court is not required to accept those allegations. *Litmans v. Litmans,* 449 Pa. Super. 209, 236-37, 673 A.2d 382, 395 (1996).

In the present case, Wife testified that Husband told her to take out loans for the children's college education because he did not want to use the money in the trust accounts. (Hearing transcript at 40.) She further testified that Husband knew she was taking out the loans because

he was standing in the kitchen when she made the phone call to obtain the loans. (Hearing transcript at 41.) Wife also testified that Husband told her that it was her department to find the tuition money. (Hearing transcript at 41-42.) Husband testified that, while he was aware that Wife took out Parent PLUS loans, he did not approve of the loans and had nothing to do with them. (Hearing transcript at 116.)

Based on the master's use of the words "apparently" and "may" in crediting Wife with the Parent PLUS loans, the court believes that the master did not definitively find that the parties agreed to take out the loans. Further, the master was in the best position to determine truthfulness of the witnesses, and her report gave the court no reason to distrust Husband's testimony. Therefore, the court finds that the contradictory testimony of the parties does not depict a meeting of the minds necessary to establish an oral agreement regarding the Parent PLUS loans. The loans are not marital debt and Husband's exception 1 is granted.

(2) *Master erred by including as a factor for equitable distribution post-separation Parent PLUS loans incurred by Wife (as expense of Wife).*

Husband argues that the master should not have taken the post-separation Parent PLUS loans into consideration as a debt incurred and paid by Wife. Husband asserts that, because there is no legal obligation to provide one's children with post-secondary education support, Wife's "gratuitous decision" to provide such support should not be imposed upon Husband. As stated above, Husband's argument is correct in regards to whether the Parent PLUS loans are considered marital debts. However, the

argument is inapplicable in terms of current economic circumstance of the parties, which requires merely a statement of the debts and/or assets of each party.

Under 23 Pa.C.S. §3502(a)(10), current economic circumstance is a factor to consider for the purposes of equitable distribution. In order to fully develop this factor, the master was required to consider the post-separation loan debt in her analysis, just as she would have been required to Husband's debt, if he had any.[5] The master properly noted all current debts, or lack thereof, of both parties because the statute required her to do so. Further, the master noted in her report that she only considered Wife's indebtedness on the loans in regards to Wife's present economic circumstances. (Master's report at 26.) Therefore, because the master was required to consider Wife's debts as part of an equitable distribution factor, Husband's exception 2 is denied.

(3) *Master erred by determining the Husband retained household contents having value of $16,000.*

Husband argues that master assigned too high of a value to the property that Husband retained. Husband testified that he retained $5,000 worth of property. (Hearing transcript at 121.) He further testified that the property he kept was in "average" condition and was purchased throughout the 27-year marriage. (Hearing transcript at 120.) According to Husband, he kept the following property: pictures, furniture, televisions, sewing machine, filing cabinets, desk, bookshelf, computer, photo album, books, china, bedroom furniture, a piano,

---

5. In fact, Husband had little to no debt, which the master noted in her report. (Master's report at 27.)

appliances, lawn machinery and silverware. (Hearing transcript at 117-20.)

Wife testified that Husband kept $15,000 worth of property. (Hearing transcript at 55.)[6] According to Wife, Husband kept living room furniture (nine pieces—includes piano), dining room furniture (nine pieces), kitchen furniture (six pieces), family room furniture (five pieces), master bedroom furniture (six pieces), kids' bedroom furniture (11 pieces in three bedrooms), lamps, dishes, pots, pans, Tupperware, china, tools, riding mower, snow blower, sheets, towels, washer and dryer set (purchased in 1997 or 1996), chest freezer, second refrigerator. (Hearing transcript at 51-55.) Wife further testified that she had credit card debt of $16,000, much of which came from reestablishing her home. (Hearing transcript at 60.)

Neither party had the property appraised. The master found that, even at 30 years old, these items were of good quality and would have been expensive to replace even at "private used prices." (Master's report at 11290 CD 2003.) She then valued the property at $16,000, which is a higher value than either party testified to. It seems that the master used Wife's replacement price as the value for the property. This was an error, as Wife was buying brand new items to replace items that were acquired over a 27-year marriage. Therefore, the court must correct this error and value the property based on the testimony.

---

6. The court notes that the master misstated Wife's testimony as valuing the property at $20,000. See master's report at 10.

First, it is important to note the general rule that "an owner of property, real or personal, is competent to testify as to its value." *Silver v. Television City Inc.,* 207 Pa. Super. 150, 157, 215 A.2d 335, 339 (1965). This presumption is overcome only by a clear showing that the owner has no knowledge of value. *Id.* Further, while the Divorce Code does not include a method of valuing assets, the Pennsylvania Superior Court has provided some guidance on the issue, stating that courts are free to accept all, portions of, or none of the testimony regarding the true and correct value of property. *Aletto v. Aletto,* 371 Pa. Super. 230, 537 A.2d 1383 (1988). In *Aletto,* the Superior Court upheld the trial court's decision to assign equal weight to the testimony of two experts and average the two figures to arrive at fair market value of a marital residence. 371 Pa. Super. at 242, 537 A.2d at 1389.

Here, the only evidence this court has regarding value of the household contents is the parties' testimony. The parties generally seem to be in agreement about the specific items that Husband retained. The only conflict is their differing opinions as to the value. The master gave no indication that either party was untrustworthy. Further, the parties would clearly be able to form an opinion regarding value of the items because they were the buyers and had knowledge of the value of the items when they were new. Acting on the presumption that both parties, as owners, were competent to testify regarding the household contents' value, the court assigns equal weight to the parties' opinions. Therefore, because the court finds both opinions credible, it will follow the lead of the *Aletto* court and take the average of the two values, which is $10,000. Husband's exception 3 is granted.

(4) *Master erred by considering as a factor for equitable distribution that Wife paid $800 per month in rent.*

Husband argues it is error to include this amount, as Wife failed to provide evidence (other than her own testimony) that she pays rent. Wife testified that she pays $800 per month for rent. (Hearing transcript at 35, 63, 73-74.) Wife resides in a home that was purchased by her mother in April 2005 for $140,000. (Hearing transcript at 73-74.) The mortgage payment is $879, and Wife is reimbursing her mother for the mortgage by paying $800 per month in rent. (Hearing transcript at 73.) The master evidently found Wife's testimony on this issue to be credible, as she considered the rent in her report. This court has no reason to upset the master's determination of witness credibility in this instance. Further, the court is aware of no statute that requires documentation to be provided before it can give credence to a statement regarding rent. If Husband wanted to see such documentation, he had the opportunity to obtain it through discovery. Because Husband did not pursue documentation, all the court has before it on this issue is Wife's testimony and the master's finding of Wife's credibility. Therefore, Husband's exception 4 is denied.

(5) *Master erred by not giving Husband credit for post-separation payoff of the Pontiac Grand Am in the amount of $4,430.*

Husband argues he should have been credited $4,430 for paying off a marital debt. Husband's exhibit 8 shows that when he traded in the Grand Am, a lien in the amount of $4,430 was paid off. The master mentioned Husband's exhibit 8 when she credited him with the Grand Am as

a $5,300 marital asset, but she did not discuss the lien that Husband paid off. The court believes this was an oversight on the master's part and must be corrected. Therefore, Husband's exception 5 is granted.

(6) *The Master erred by awarding Wife 55 percent of the marital assets.*

Both parties argue that the master erred in her equitable distribution scheme. (See Wife's exception 9, below.) Husband argues that Wife should have received less than 55 percent because the master took Parent PLUS loans into account as marital property, and the master improperly assessed the household assets, both of which affected the distribution scheme. The court agrees that the Parent PLUS loans and household assets affected the cash payment that Husband was required to pay to Wife. However, the amounts involved in those aspects of distribution were not enough to affect the overall distribution of a marital estate in excess of $1,000,000.

Wife argues that she should have been awarded a greater portion of the marital property, and employs Factors 3, 5, 9 and 10 to support her argument.[7] Each of these factors will be addressed briefly below.

### Factor 3: Sources of Income

Wife asserted that Husband's separate property should be valued at $138,000, rather than the master's finding of "over $85,000." Wife also argued that she should have

---

7. Factor 3 pertains to parties' sources of income, estate, liabilities and needs. Factor 5 pertains to parties' future assets and income. Factor 9 pertains to the standard of living during the marriage. Factor 10 pertains to the overall economic circumstances of the parties.

been credited for several expenses, which the master did not include because they were not "Wife's expenses," but rather children's expenses. Both Wife and the master noted that Wife's pension is about $33,000 more than Husband's.[8]

### Factor 5: Future Assets and Income

Wife argues that Husband has a greater opportunity for future increases in income. The master acknowledged that Husband has a greater opportunity for income, but notes that Wife's pension is larger, and, once Wife stops "funding the grown children's lives and educations to the extent she presently is," acquiring capital assets is not out of the question for her.

### Factor 9: Standard of Living During the Marriage

Wife argues that she has had to live in more modest homes since separation, she pays for her children's college education, and holds down three to four jobs to meet her expenses. The master noted that "[w]ith the help of Wife's relatives and post-separation gifts of used furniture and Wife expending some $16,000 to reestablish her household, each party continues to reside in a $140,000 home with the amenities of a middle class lifestyle."

---

8. Wife further stated that she believes Husband has received a pay raise since the hearing (and is earning $85,000). She also stated that her second job as a tutor has been terminated. The court notes that it is acting in a reviewing capacity. Therefore, while the court is allowed to independently review the evidence from the master's hearing, it is not allowed to consider any new evidence or changes in circumstance that have occurred since that hearing.

Therefore, Wife seems to be maintaining the same standard of living that she had during the marriage.

Factor 10: Present Economic Circumstances

Wife argues that Husband has received a pay raise since the hearing. As discussed above in footnote 7, the court cannot consider any new evidence. Wife does have a larger pension than Husband. Wife's assistance to her adult children is commendable, but it is not a factor that the court can take into consideration.

Based on the above factors, and all of the equitable distribution factors, which the master discussed in her report, the court finds no reason to disturb the master's distribution scheme. As previously stated, the amounts involved in these aspects of distribution were not enough to affect the overall distribution of a marital estate in excess of $1,000,000.

Husband's exception 6 and Wife's exception 9 are denied.

*Wife's Exceptions*

(2) *Master erred in determining value of marital residence to be $140,000 (by splitting difference between parties' appraisals)—master should have found it to be $145,000.*

Wife's expert valued the home in November 2006 at $145,000. Husband's expert valued the home in November 2005 at $135,000. Both parties stipulated to entering the appraisals into evidence without having the experts present at the hearing. The master explained in her report

that, because she did not hear testimony from the experts, and because both experts seem to be reliable in their reports, she chose to split the difference between the two appraisals, taking into account the fact that if Husband were to sell the real property, he would incur 6 percent realtor's commission and transfer taxes. (Master's report, page 5.) This made the master's final value of the marital residence $131,600.

Wife cites to *Powell v. Powell,* 395 Pa. Super. 345, 359, 577 A.2d 576, 583 (1990), for the proposition that "since equitable results will most likely flow from providing the court with the most recent information available, it is persuasively argued that this would occur by valuing marital property as of the date of the equitable distribution hearing." The *Powell* court refused to recognize a specific valuation date for every case because it would deprive the court of necessary discretion. However, the court stated that "the valuations should be made as close as possible to the property distribution date." Wife argues that because her appraisal was one year closer to the distribution date, hers should be the value that is used for distribution purposes.

The court finds that the master properly averaged the two appraisals. The court first established a procedure for the real estate appraisal in 2004 (see order of court of June 15, 2004, paragraph 2). Husband obtained an appraisal in November 2005 and provided the report to Wife in June 2006. Wife did not raise concerns about Husband's appraisal until eight days prior to the master's pretrial conference when she requested additional time to complete her own appraisals and additional discovery. While the court granted Wife's request for a continuance,

it also sanctioned Wife for her dilatory conduct in this matter. While Wife's appraisal is more current, it is due to Wife's delay and it would be improper to award her an advantage because of her own actions.

This case is a prime example of why the *Powell* court refused to recognize a specific valuation date for every case. While Wife's appraisal occurred closer in time to the hearing date, based on the circumstances above, it would be inequitable to rely solely on Wife's appraisal. The parties stipulated to entering both of their appraisals without expert testimony. Without any record to examine except for the appraisals themselves, the court finds that the most equitable thing to do is to give equal weight to both appraisals and take the average, which is what the master did. Therefore, the court denies Wife's exception 2.

(4) *Master erred in not granting Wife's request for fair rental value.*

The master denied Wife fair rental value because the master found that Husband's post-separation payments were greater than the fair rental value that Wife would have received. (Master's report at 29.) Wife argues that the master erred in her calculations of the rental value. Rather than attempt to explain the master's calculations versus Wife's calculations, the court sets forth its own calculations using the stipulated numbers for the amount of time Husband remained in the marital residence post-separation; the fair rental value of the residence; and Husband's post-separation payments on mortgage, real estate tax and homeowner's insurance. These amounts are:

$695     (stipulated monthly rental value)

x 43     (months)

$29,885.00     (total rental value)

Wife is entitled to 50 percent credit on fair rental value.

$29,885.00 divided by 2 = $14,942.50 (Wife's credit for rent).

Husband and Wife were jointly responsible for mortgage, real estate tax and homeowner's insurance. Husband paid all of these expenses over the 43 months after separation. Therefore, Wife's credit for fair rental value must be offset by her share (half) of those expenses.

$4,184.00     (half of the mortgage)

$3,557.50     (half of the real estate tax)

+$1,241.50     (half of the homeowner's insurance)

$8,983.00     (Total payments Husband made on Wife's behalf)

$14,942.50     (half of fair rental value)

-$8,983.00     (half of post-separation residence expenses)

$5,959.50     (Wife's credit for fair rental value)

The court's calculations show that Wife is entitled to a credit of $5,959.50.[9] Therefore, the court grants Wife's exception 4.

---

9. The court also notes that Wife's calculations are correct except for a minor subtraction error of $2.

*(5) Master erred in finding that Wife received parties' 2002 income tax refund.*

Wife argues that the Master should not have credited her with the 2002 tax return because the parties agreed to use the 2002 tax refund for a computer for their son, Joshua. Wife further contends that the parties agreed that Wife would take Joshua shopping for the computer, as Husband had little or no knowledge of computers. Wife argues that the master should have accepted her testimony rather than credit Wife for the refund.

Husband testified that he said he would buy Joshua a computer. (Hearing transcript at 158.) He testified, however, that he never bought Joshua the computer because he was never given his share of the 2002 tax return. (Hearing transcript at 158-59.) Wife testified that Husband told her that when he got his share of the 2002 tax return he would take Josh and use the money to buy a computer for school. (Hearing transcript at 162.) Wife testified that she told Husband if that was what he was going to do, she would take Josh and get the computer, and Husband agreed. (Hearing transcript at 162.)

The court finds that the contradictory testimony of the parties does not establish a meeting of the minds necessary for an oral agreement. The only issue regarding the tax return that the parties agreed upon was that Wife received it, and did not give Husband his share. Therefore, the master properly deemed the tax return to be a marital asset subject to distribution and credited Wife for it. Wife's exception 5 is denied.

(6) *Master erred in finding that Husband did not dissipate value of Pontiac Grand Am.*

In her brief, Wife argued that Husband dissipated the value of the Grand Am because the parties' son, Josh, was willing to purchase the car for the entire indebtedness in June 2003. Husband traded the car in on July 26, 2005. Wife asserts that Husband traded the car in at a loss. The master refused to find that Husband dissipated marital property by choosing to trade in the car rather than pay it off by selling it to Josh. Rather, the master found that Husband had as much right to trade in the Grand Am as Wife had to trade in the Chevy Blazer.

The court first notes that there is no testimony regarding the exact date that Wife proposed that Husband sell the car to Josh. Wife testified:

"After I filed for divorce, John told Josh he wanted the car back, that he couldn't afford to make payments on it any more, and that it was my fault that he wanted the car back. Josh had saved $4,000 working at a grocery store. And my mother asked me if I would get the amount of money owed on that particular car and whatever Josh had she would make up the difference and they would buy the car from John for what he owed on it, which I did make that offer to John, and he said why would he sell it to me for what he owed on it when he could sell it outright and make a profit on it, so John took the car and Josh used his savings and the money from my mother to purchase another vehicle." (Hearing transcript at 48-49.)

Husband testified that he did not remember a conversation about Josh buying the car. (Hearing transcript at

124, 158.) Rather, Husband testified that he attempted to sell the vehicle, and had three people look at it, but ultimately was unable to sell it. (Hearing transcript at 124-25.)

Based on the parties' testimony, the court does not believe that Wife met her burden of proof that Husband dissipated a marital asset by not selling the car to Josh. First, it is unclear as to whether such an offer even existed, as the parties have contradictory testimony on this issue. Next, even if such an offer was made, Husband was under no obligation to sell the car to Josh or anyone else, just as Wife was under no obligation to trade in the Chevy Blazer.

In Pennsylvania, for the purposes of equitable distribution, a court must consider among other factors, "[t]he contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property . . . ." 23 Pa.C.S. §3502(a)(7). Black's Law Dictionary defines dissipation as "[t]he use of an asset for an illegal or inequitable purpose, such as a spouse's use of community property for personal benefit when a divorce is imminent." Black's Law Dictionary 486 (7th ed. 1999). In the present case, the value of the Grand Am was depreciated, but not due to any illegal or inequitable action on Husband's part.

Further, other Pennsylvania courts have found dissipation of marital assets in situations where a party: increased tax liability resulting from filing individual returns rather than joint returns;[10] gambled away assets;[11]

---

10. *Gruver v. Gruver,* 372 Pa. Super. 194, 539 A.2d 395 (1988).

11. *Chadwick v. Chadwick,* 68 D.&C.4th 369 (Delaware Cty. 2004).

unilaterally transmitted funds from a bank account;[12] or stored vehicles in the elements with no protection, allowing them to rust.[13] This court does not believe that choosing to trade in a vehicle rather than sell it is comparable to the situations above.[14] There is no testimony that Husband neglected or failed to maintain the Grand Am during the two years that he had sole possession of it. While it is true that the car depreciated in value over those two years, it seems that the depreciation was the natural depreciation that occurs with any vehicle, and Husband's actions did not depreciate it any more than is normal. Further, if Wife was concerned that Husband was depreciating the vehicle, she could have filed for an injunction or asked the court to order sale of the vehicle in 2003. Because Husband was under no obligation to sell the vehicle, it was still his to use. The court agrees with the master that Husband had as much right to trade in the Grand Am as Wife had to trade in the Chevy Blazer. Therefore, Wife's exception 6 is denied.

(7) *Master erred in failing to consider Husband's pre-separation, individual checking account as a marital asset.*

Wife argues that the parties' separate checking accounts should have been included in marital assets. Wife testified that she was responsible for finances until 1999, when she insisted the parties get their own checking accounts. (Hearing transcript at 27.) Each party opened his/

---

12. *Capone v. Capone*, 1985 WL 384607 (Philadelphia Cty. 1985).

13. *Dolinar v. Kapton*, 80 D.&C.4th 156 (Allegheny Cty. 2006).

14. The court notes that it is not bound by any of these cases, except *Gruver.* Rather, they serve as an illustration of the types of situations where Pennsylvania courts have found dissipation of marital assets.

her own checking account at S&T. Clearly, bank accounts of the parties fall under the definition of marital assets, and should have been included in equitable distribution.

The parties provided testimony of the checking account balances, albeit at different times. Wife testified that as of the date of separation, her checking account had a balance of $300, and Husband's had a balance of between $7,000 and $8,000 a few months prior to separation. She claims Husband told her the balance while balancing his checkbook. (Hearing transcript at 35-36.) Husband testified that at the time of the master's hearing, his S&T checking account balance varied between $3,000 and $4,000. (Hearing transcript at 135.) Husband failed to rebut Wife's testimony about the value of the accounts at separation. Therefore, the court must accept Wife's uncontradicted testimony about the value of the separate bank accounts at separation. Wife's exception 7 is granted and the court will include $300 as the value of Wife's account, and $7,000 as the value of Husband's account.

(8) *Master erred in finding that Husband had only $85,000 in separate property.*

Wife argues that Husband's income and expense sheet identifies (in Husband's handwriting) that Husband has separate assets in the amount of $138,000 (comprised of: $4,000 in S&T checking; $16,000 in S&T savings; $4,000 in credit union savings; $29,000 in municipal bonds; and $85,000 in CDs). Husband testified that these are both non-marital and post-marital monies from inheritance and savings. (Hearing transcript at 136-38.)

The court first notes that there was some confusion about Husband's municipal bonds. Husband testified that he and his brothers all have a share in the bonds, but that his share was $29,000, not one-third of $29,000. (Hearing transcript at 146.) At argument, Husband's attorney contended that there was an error at the hearing, and Husband's share actually is one-third of $29,000. Further, the master found that Wife did not "meet her burden of proof" as to what portion of the bonds constitutes an increase in value of Husband's interest from the time he received them until the time of separation. (Master's report at 31.)

Fortunately, the court is able to resolve this issue without analyzing what Husband's share of the bonds is. The master found that Husband "has been able to have monies directed toward savings through S&T and he has his separate property, his inheritance, at *over* $85,000." (emphasis added) (Master's report at 20.) While the master did not calculate all of the numbers as Wife did, she was clearly aware that Husband had more than $85,000 in separate property. This is evidenced by her reference to Husband's S&T savings account, and her use of the word "over."

Further, after reading the master's report, it does not seem as if the master gave a great deal of weight to the current economic circumstance factor. Rather, she addressed it and treated it as one of many factors. Therefore, even if the master found that Husband had separate property in the amount of $138,000, the court does not believe that it would have made a difference in the way the master distributed the marital estate.

(9) *Master erred in not awarding Wife 60 percent of the marital property.*

See Husband's exception 6 above.

(10) *Master erred in not granting Wife alimony.*

Wife argues that that master failed: to consider the needs of parties and difference in income, to find Husband committed indignities, and to allow testimony regarding Husband's discipline of the parties' children as evidence of indignities.

Wife asserts that there is a great discrepancy between the standard of living which Wife enjoyed during the marriage and the standard of living since separation. She argues that Husband is living debt free while she is living paycheck to paycheck with substantial debt repayment.[15] As discussed above, it seems that both Husband and Wife are enjoying the same standard of living that they enjoyed during the marriage. They are living in comparable homes with similar furnishings. Further, as explained above, Wife has a greater pension than Husband, and only has "substantial debt repayment" because she generously chose to take out loans for her children's education. Therefore, the court finds that the needs, assets, incomes and liabilities of the parties do not reflect a need for alimony.

As for the marital misconduct factor, Wife argues that Husband's "moodiness/refusal to talk to Wife and the

---

15. Wife again argues that the court should consider the "change in circumstances" since the master's hearing. The court again notes that it is prohibited from doing so.

children; Husband's withholding of his paycheck; Husband's criticisms of Wife and the manner in which Husband treated the parties' children when disciplining them" constitute indignities. Wife asserts that, in Pennsylvania, a determination of whether indignities have occurred must be decided on a case-by-case basis. She cited the Pennsylvania Superior Court that:

> "While no general rule can be formulated as to what constitutes indignities in a particular action for divorce it has been held many times that vulgarity, unmerited reproach, habitual contumely, *studied neglect,* intentional incivility, manifest disdain, abusive language, malignant ridicule and *any other plain manifestation of settled hate and estrangement* are sufficient grounds for divorce as they, either individually or collectively, amount to indignities to the person." *Rollman v. Rollman,* 280 Pa. Super. 344, 349, 421 A.2d 755, 758 (1980) (citing *Schrock v. Schrock,* 241 Pa. Super. 53, 359 A.2d 435 (1976). (emphasis added)

After reviewing the record, the court agrees with the master that Husband's criticism of Wife's cooking, arguments over money and how to raise the children, and "withholding his paycheck" does not amount to marital misconduct. Wife also alleges Husband committed marital misconduct by refusing to speak to her. Wife testified that Husband refused to speak to her for months at a time, and that she and the parties' son, Josh, spent the last two years in the house sitting in the basement because Husband would not talk to either of them. (Hearing transcript at 30.) She further testified that after months of not speaking, Husband would suddenly start talking to her again like nothing had happened. (Hearing tran-

script at 30.) Husband testified that there were periods of time when the parties would not talk and he would internalize what had happened before they could begin speaking again. However, he testified that if Wife would talk to him, he would answer her. (Hearing transcript at 151.) The master did not give the court guidance on whose testimony was credible on this issue, as the master did not believe that this behavior constituted marital misconduct even if Wife's testimony was found to be credible. (Master's report at 36.) This court maintains that, based upon the above definition of marital misconduct, refusing to speak to one's spouse is a grievous indignity because it is the epitome of neglect and a clear manifestation of estrangement. The court is unable to make a finding as to whether such indignity actually occurred in the present case, as the only evidence is conflicting testimony from the parties. The master was in the best position to decide who was more credible. However, as explained below, it is not necessary for the court to make a finding on this issue, as it would not change the alimony determination.

Wife also argues that the master erred in refusing to let her testify about Husband's alleged abuse towards the children. Despite a claim in the divorce complaint regarding such abuse, the master instructed Wife to limit her testimony to abuse between her and Husband. (Hearing transcript at 29.) Wife cites to *Beaver v. Beaver* to support the proposition that information regarding abuse of the children should be considered as evidence of an indignity. See 313 Pa. Super. 512, 460 A.2d 305 (1983). In *Beaver,* the Pennsylvania Superior Court stated, "if a spouse mistreats the child of the moving spouse, such

mistreatment can constitute an indignity." *Id.* at 517, 460 A.2d at 309 (citing *McCaskey v. McCaskey,* 253 Pa. Super. 360, 385 A.2d 378 (1978). The court therefore agrees with Wife that she should have been given an opportunity to testify about Husband's behavior towards the children. However, the court does not see a need to remand on this issue.

Even assuming there was a clear finding of marital misconduct, it is only one of 17 factors, and must be assessed in light of those other factors. As explained above, the other alimony factors show that the parties are on relatively even ground. The court finds that the other alimony factors as applied to this case would outweigh marital misconduct in favor of the master's decision to deny alimony. Therefore, the court finds that it is unnecessary to remand this case on the issue of marital misconduct because it would not change the alimony outcome. Wife's exception 10 is denied.

Wherefore, the court makes the following order.

### ORDER

And now, December 3, 2007, this matter having come before the court on both parties' exceptions to the master's report and recommendations and the court having heard argument thereon, it is hereby ordered and directed that:

(1) The parties, Anne Catherine Lizik, plaintiff, (Wife), and John Gerald Lizik Jr., defendant, (Husband) are divorced from the bonds of matrimony.

(2) Wife is awarded the following:

(a) All vehicles, household and personal property presently in her possession;

(b) An engagement ring, presently in possession of Husband, which Husband shall transfer to Wife within 30 days from the date of this order;

(c) Wife's PERS pension in entirety; and

(d) A cash payment from Husband in the amount of $107,858.92, to be paid within 30 days from the date of this order.

(3) Husband is awarded the following:

(a) All vehicles, household and personal property presently in his possession, with the exception of Wife's engagement ring;

(b) The marital home located at 128 Deer Lane, Penn Run, Pennsylvania; and

(c) Husband's PERS pension in entirety.

(4) Wife's claim for alimony is denied.

(5) Wife's claim for counsel fees is denied.